Fourth Division
July 31, 2008

No. 1-06-1196

| | | |
|---|---|---|
| BENJAMIN HERNANDEZ, Independent Administrator of the Estate of Alma Hernandez, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| ALEXIAN BROTHERS HEALTH SYSTEM, a Corporation, | ) ) ) | No. 03 L 4613 |
| Defendant | ) ) ) | |
| (Naphtali Kogan, M.D., and Cardiovascular Associates, S.C., a Corporation, | ) ) | Honorable |
| Defendants-Appellees). | ) ) | Diane J. Larsen, Judge Presiding. |

PRESIDING JUSTICE NEVILLE delivered the opinion of the court:

Plaintiff, Benjamin Hernandez, the independent administrator of the estate of Alma Hernandez, filed a complaint against the defendants, Alexian Brothers Health System,[1] Naphtali Kogan, M.D., and Cardiovascular Associated, S.C., and alleged, *inter alia*, that the defendants' negligent acts were the proximate cause of Alma Hernandez's death on June 6, 2002. Dr. Kogan and his employer, Cardiovascular Associated, S.C. (Cardiovascular), filed a motion for summary judgment and argued that the provisions in the Good Samaritan Act immunized Dr. Kogan from civil liability for providing emergency medical care to Ms. Hernandez on June 6, 2002. 745 ILCS 49/25

---

[1] Alexian Brothers Health System was voluntarily dismissed on June 2, 2004.

(West 2002). The trial court granted Dr. Kogan and Cardiovascular's motion for summary judgment on April 24, 2006.

On April 28, 2006, Mr. Hernandez filed his notice of appeal, and he presents three issues for review: (1) whether the trial court erred when it granted summary judgment because material issues of fact exist regarding whether Dr. Kogan acted in good faith when he decided not to issue a bill for his medical services; (2) whether section 25 of the Good Samaritan Act is unconstitutional special legislation (745 ILCS 49/25 (West 2002)); and (3) whether conferring immunity upon physicians working in hospitals, pursuant to the provisions of section 25 of the Good Samaritan Act, defeats the purpose of the Illinois Hospital Licensing Act (210 ILCS 85/1 *et seq.* (West 2002)).

BACKGROUND

On June 6, 2002, Ms. Hernandez was an in-patient at St. Alexius Medical Center (St. Alexius). While undergoing a biopsy in the radiology department at St. Alexius, Ms. Hernandez suffered a cardiac arrest[2] and was transferred to the emergency room, where "any available cardiologist" was paged over the intercom to attend to Ms. Hernandez.

Dr. Kogan, a board-certified cardiologist, was a member of the St. Alexius physicians' staff on June 6, 2002. Dr. Kogan also had a contract with St. Alexius to provide 24-hour on-call coverage at St. Alexius on a rotational schedule. On June 6, 2002, Dr. Kogan responded to the emergency

---

[2] Cardiac arrest is defined as "the complete stoppage of the heart." 1 J. Schmidt, Attorneys' Dictionary of Medicine and Word Finder C-69 (Matthew Bender 2007) (hereinafter Attorneys' Dictionary).

room page and found Ms. Hernandez intubated and asystolic[3] when he began his resuscitation efforts. Dr. Kogan inserted a central line into Ms. Hernandez's femoral artery and ordered an echocardiogram, which he interpreted at her bedside. Dr. Kogan then attempted pericardiocentisis[4] from multiple locations. However, resuscitation efforts failed and Ms. Hernandez died on June 6, 2002. Finally, on April 16, 2003, Mr. Hernandez, the independent administrator of the estate of Alma Hernandez, filed a complaint and named Dr. Kogan and his physicians' group, Cardiovascular, among others, as defendants.

Defendants' Motion for Summary Judgment

After the plaintiff filed his complaint, Dr. Kogan and Cardiovascular filed a motion for summary judgment, pursuant to section 2-1005 of the Code of Civil Procedure. 735 ILCS 5/2-1005 (West 2002). Plaintiff's complaint and Dr. Kogan's affidavit were attached as exhibits to the defendants' motion for summary judgment.

In his affidavit Dr. Kogan averred, in pertinent part:

> "4. Though I was a member of the medical staff of St.
> Alexius, neither by contract, agreement, nor pursuant to any
> Hospital policy, rule or regulation was I obligated to respond to
> the request for assistance. I was not a member of any

---

[3] "Asystolic" is defined as "the failure of the heart to contract." 1 J. Schmidt, Attorneys' Dictionary A-578 (Matthew Bender 2007).

[4] Pericardiocentisis is "the surgical opening or puncture of the sac which surrounds the heart (the pericardium) for the purpose of drawing off abnormal fluid." 4 J. Schmidt, Attorneys' Dictionary P-160 (Matthew Bender 2007).

designated code response team at St. Alexius, nor was Cardiovascular Associates contracted to provide emergency response assistance to Hospital codes. I was not 'on call' in the emergency room to respond to cardiac emergencies on June 6, 2002.

5. I provided care to Ms. Alma Hernandez to the best of my abilities; she was in full cardiac arrest when I arrived and she was never resuscitated.

6. Neither Cardiovascular Associates nor I billed Ms. Hernandez, or her family or her insurer for my medical efforts to revive her on June 6, 2002."

Because Dr. Kogan (a) rendered emergency care, and (b) did not bill Ms. Hernandez, the defendants claimed that Dr. Kogan's actions on June 6, 2002, were immunized from civil liability by the provisions of section 25 of the Good Samaritan Act. 745 ILCS 49/25 (West 2002). Therefore, the defendants maintained that they were entitled to summary judgment.

Plaintiff's Response to Defendants' Motion for Summary Judgment

Mr. Hernandez responded to the defendants' motion for summary judgment first by arguing that the Good Samaritan Act does not apply to Dr. Kogan or his physician's group, Cardiovascular, because (a) the defendants were paid to provide emergency care at St. Alexius in June 2002; and (b) the decision not to bill Ms. Hernandez was not made in good faith. In support of his argument, Mr. Hernandez attached 11 exhibits, including, the contract between Dr. Kogan and St. Alexius for on-

call cardiac coverage services, St. Alexius' bylaws and the general rules and regulations of the medical/dental staff, and the transcript from Dr. Kogan's December 22, 2003, deposition.

Physician On-Call Coverage Agreement

Mr. Hernandez relied on the terms of the contract between St. Alexius and Dr. Kogan and the "Physicians On-Call Coverage Agreement" (On-Call Agreement) and argued that the documents established that Dr. Kogan was paid to provide on-call cardiac coverage services at St. Alexius. Specifically, Mr. Hernandez cited the following provisions of the On-Call Agreement, which he maintains set forth Dr. Kogan's duties as an on-call physician:

"2.2(a) when called by the Hospital or a Hospital Emergency Room physician, [on-call] Physician shall respond in accordance with the Emergency Medical Services and Trauma Center Code (77 Ill. Adm. Code 515).

(b) When called to provide On-Call coverage pursuant to this Agreement, Physician agrees to treat each patient as Physician's private patient, billing the patient and not the Hospital for services rendered.

(c) Physician shall accept each patient treated as a result of this Agreement as Physician's private patient until the patient has been transferred to the care of another physician.

***

(e) Physician shall be responsible to provide On-Call Coverage in accordance with the schedule established by the Director of Medical Staff

Services."

Article III of the On-Call Agreement provided that St. Alexius would pay Dr. Kogan, during each year, $100 for 60, 24-hour call periods of on-call coverage and $200 for on-call coverage provided thereafter by the doctor.[5] The On-Call Agreement further provided that if called by St. Alexius or a St. Alexius emergency room physician, Dr. Kogan was to directly bill patients for his professional services. Based upon the aforementioned terms in the On-Call Agreement, Mr. Hernandez maintained that section 25 of the Good Samaritan Act is inapplicable because Dr. Kogan's medical services on June 6, 2002, were not those of a "volunteer"[6] physician because he was a physician acting as an independent contractor who was paid by St. Alexius for rendering on-call cardiac coverage at the hospital on June 6, 2002.

St. Alexius' Medical/Dental Staff Rules

Mr. Hernandez also pointed out that Dr. Kogan testified at his deposition that he was "making rounds" at St. Alexius on June 6, 2002, and that he was not "on-call" that day. Mr. Hernandez argues,

---

[5] After Dr. Kogan had provided 60 call periods in any one-year contract term, St. Alexius agreed to pay him at the rate of $200 for each 24 - hour period of coverage.

[6] §2 of the Good Samaritan Act provides that the purpose of the Act is to immunize citizens who volunteer to help others:

> "Sec. 2. Legislative purpose. The General Assembly has established numerous protections for the generous and compassionate acts of its citizens who volunteer their time and talents to help others. These protections or good samaritan provisions have been codified in many Acts of the Illinois Compiled Statutes. This Act recodifies existing good samaritan provisions. Further, without limitation the provisions of this Act shall be liberally construed to encourage persons to volunteer their time and talents." (Emphasis added.) 745 ILCS 49/2 (West 2002).

that as a staff physician, Dr. Kogan was required to strictly comply with St. Alexius' Medical Staff bylaws,[7] and with the general rules and regulations of the medical/dental staff (Medical/Dental Staff Rules). According to Mr. Hernandez, Dr. Hogan was contractually obligated by his reappointment application, the On-Call Agreement, the bylaws and the rules and regulations of St. Alexius to respond to Ms. Hernandez's emergency. Mr. Hernandez maintained that section 25 of the Good Samaritan Act did not immunize Dr. Kogan from civil liability for the medical services he provided to Ms. Hernandez on June 6, 2002, because Dr. Kogan was on the medical staff of St. Alexius, and he was not rendering emergency care to Ms. Hernandez "without fee" because he was compensated by St. Alexius for providing medical care to the hospital's patients. Therefore, Mr. Hernandez argued, because Dr. Kogan had a contractual duty as a staff physician at St. Alexius to render emergency medical care to Ms. Hernandez and because he did not act "without fee," as required by the Good Samaritan Act, he should not be immunized from civil liability by the Good Samaritan Act for the medical services he provided on June 6, 2002.

Mr. Hernandez also argued that the Good Samaritan Act when applied to doctors in hospitals conflicts with the purposes of the Illinois Hospital Licensing Act (Hospital Licensing Act). 210 ILCS 85/2 (West 2002); see also 210 ILCS 85/10 (West 2002); 77 Ill. Adm. Code Part 250 (Hospital Licensing Requirements). The Illinois Hospital Licensing Act is implemented by provisions of the

[7] Hospital licensing requirements include a mandate:
" a) The medical staff shall be organized in accordance with written bylaws, rules and regulations, approved by the Governing Board." 77 Ill. Adm. Code §250.310, amended at 32 Ill. Reg. 7932 (eff. May 12, 2008).

Illinois Administrative Code and mandates that hospitals offering basic[8] and comprehensive[9] emergency treatment services provide the minimum physician coverages specified therein. 77 Ill. Adm. Code 250.710, amended at 32 Ill. Reg. 7932 (eff. May 12, 2008). Mr. Hernandez argued that the appellate court's decisions construing the Good Samaritan Act interfere with the purposes of the Hospital Licensing Act when they immunize physicians in hospitals who treat emergencies and choose not to bill for their services. Therefore, Mr. Hernandez concluded that, in accordance with state regulatory mandates, St. Alexius' Medical/Dental Staff Rules imposed a legal duty upon Dr. Kogan, a staff physician physically present and working at St. Alexius on June 6, 2002, to respond "to a life and limb threatening situation."

### Constitutional Claims

In further response to the defendants' motion for summary judgment, Mr. Hernandez argued that the Good Samaritan Act is facially unconstitutional special legislation because, when applied in a hospital setting, it arbitrarily and unreasonably distinguishes between hospital patients in need of emergency care who are treated by their own physicians, who can be held liable for their negligent acts, and hospital patients who are treated by doctors who "volunteer" to treat them in a hospital and

---

[8] Hospitals providing basic emergency treatment services must insure that at least one physician is available in the emergency department at all times and that physician specialists representing the specialties of medicine, surgery, pediatrics and maternity shall be available in minutes. 77 Ill. Adm. Code §250.710(b), amended at 32 Ill. Reg. 7932 (eff. May 12, 2008).

[9] Hospitals providing comprehensive emergency treatment services must insure that at least one licensed physician is available in the emergency department at all times; physician specialists representing the major specialities and subspecialities shall be available in minutes. 77 Ill. Adm. Code §250.710(a), amended at 32 Ill. Reg. 7932 (eff. May 12, 2008).

cannot be held liable.

Mr. Hernandez also argued that the Good Samaritan Act was unconstitutional as applied in this case. In this regard, Mr. Hernandez contends, *assuming arguendo,* that there is a rational basis for providing civil immunity to physicians who, in the legislature's words, "volunteer to render assistance on the streets of Illinois," that rationale does not apply here because (1) Dr. Kogan is a paid agent providing on-call coverage, and (2) Dr. Kogan is a staff physician at St. Alexius who has a duty imposed on him by the rules and regulations of medical/dental staff when he is in the hospital to respond to life-threatening emergencies at St. Alexius.

Defendants' Reply in Support of Motion for Summary Judgment

In reply to Mr. Hernandez's response, Dr. Kogan and Cardiovascular contend that the terms of the On-Call Agreement only obligated Dr. Kogan to respond "when called by Hospital or a Hospital Emergency Room physician" but that he had no duty to respond to "code blues." The defendants also argue that any compensation received for on-call coverage was paid by St. Alexius for services rendered to the hospital, not to the patient, as the On-Call Agreement allows Dr. Kogan to bill patients separately. Because he did not issue a bill to Ms. Hernandez, Dr. Kogan argues that the Good Samaritan Act immunized him from civil liability for the emergency medical care he provided to Ms. Hernandez on June 6, 2002. The defendants also argue that the Hospital Licensing Act applies to hospitals, not physicians; that the Good Samaritan Act is "completely independent" of the Hospital Licensing Act; and that there is no conflict between the two statutes. Finally, the defendants argue that the Good Samaritan Act, originally enacted in 1965 as the Illinois Medical Practice Act, is entitled to a presumption that it is rationally related to a legitimate state interest and

is, therefore, constitutional.

Mr. Hernandez's Surresponse to Defendants' Motion for Summary Judgment

Mr. Hernandez elaborated upon his arguments that Dr. Kogan was compensated as a staff physician and was acting pursuant to his On-Call Agreement. Mr. Hernandez attached Dr. Kogan's deposition testimony and argued that whether Dr. Kogan's decision not to bill Ms. Hernandez was made in good faith was an issue for the trier of fact. Finally, Mr. Hernandez argued that Dr. Kogan's testimony and the averments in his affidavit were not entitled to an inference of good faith because a jury could reasonably infer from Dr. Kogan's knowledge of Ms. Hernandez's condition that he decided not to follow his normal billing procedure on June 6, 2002, because he was aware that medical malpractice had occurred.

Good Faith Discovery

The trial court granted Mr. Hernandez's motion for supplemental discovery after the decision in <u>Estate of Heanue v. Edgcomb</u>, 355 Ill. App. 3d 645 (2005). In <u>Estate of Heanue</u>, this court held that physicians seeking immunity under the provisions of the Good Samaritan Act would not only be required to show that they had rendered emergency care without fee but, for the first time, they also were required to show that they had done so in good faith. <u>Estate of Heanue</u>, 355 Ill. App. 3d at 650-52.

Dr. Kogan's Answers to the Supplemental Interrogatories

The plaintiff filed a supplemental set of good-faith interrogatories. Dr. Kogan responded to interrogatory 3 in plaintiff's second "Supplemental Set of Answers To Plaintiff's Supplemental 'Good Faith' Interrogatories" as follows:

"3. Identify the patients that you, your medical corporation and/or billing service have not billed in the last five years.

ANSWER: See my deposition testimony and my previous answers to written discovery. Further answering, in the past five years, when I did not enter into a doctor patient relationship at the request of a physician, patient, or family member, I have not turned in a bill for services rendered in such circumstances unless I considered myself to have a prior relationship with the patient, or entered into such a relationship following such care. I cannot recall any specific instances in which this has occurred, however, as in Ms. Hernandez's case, there have been situations over the years, either in the cath lab or on the hospital floors, where I assisted in providing care on an emergency basis, in desperate situations similar to Ms. Hernandez's. In those cases I have provided CPR and placed central line as needed while caring for patients. As stated, if I had no relationship with the patient or did not subsequently enter into a doctor patient relationship with those patients, I did not turn in charges." (Emphasis added.)

Cathleen Biga's Deposition Testimony

Cathleen Biga, president and chief financial officer (CFO) of Cardiac Management of Illinois (CMI), testified at her deposition that CMI had handled Cardiovascular's billing exclusively since 1999. Ms. Biga also testified that before and after 2002, CMI routinely issued bills to Dr. Kogan's patients for professional services rendered, including interpreting echocardiograms, inserting central

lines, and performing pericardiocentisis. According to Ms. Biga, putting aside Ms. Hernandez's case, she was unaware of any other time that Dr. Kogan had not submitted the patient's information that CMI needed to bill for professional services he provided to a patient.

Trial Court's Findings and Order

On April 24, 2006, the trial court made the following findings:

> "The Court finds that based on this record, there's no genuine issue of material fact. That it was an emergency situation, no fee was received, no bill was sent, and the Court finds that the decision to do that was in good faith. That it is not controverted by any testimony in the record."

The trial court considered but did not express an opinion on the plaintiff's constitutional arguments. Finally, the trial court granted the defendants' motion for summary judgment.

Analysis

Standard of Review

In this case, we are reviewing the trial court's order that granted the defendants' motion for summary judgment. Appeals from trial court summary judgment orders are governed by well-established rules. Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd., 216 Ill. 2d 294, 305 (2005). A trial court's decision to grant summary judgment should only be made where there is no genuine issue of material fact. Gaston v. Founders Insurance Co., 365 Ill. App. 3d 303, 314 (2006), quoting State Farm Fire & Casualty Co. v. Moore, 103 Ill. App. 3d 250, 257 (1981). The summary judgment procedure allows trial courts to determine whether a genuine issue of material fact exists but is not designed for the trial court to try a question of fact. Northern Illinois,

216 Ill. 2d at 305, citing Adams v. Northern Illinois Gas Co., 211 Ill. 2d 32, 42-43 (2004). "Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Northern Illinois, 216 Ill. 2d at 305, citing General Casualty Insurance Co. v. Lacey, 199 Ill. 2d 281, 284 (2002) (in considering motions for summary judgment, courts review pleadings, depositions, admissions, and any affidavits on file). In order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle him, her or it to a judgment. Hussung v. Patel, 369 Ill. App. 3d 924, 931 (2007), citing Sunderman v. Agarwal, 322 Ill. App. 3d 900, 902 (2001).

We note, however, that although it is not necessary that a plaintiff prove his or her case at the summary judgment stage (Northern Illinois, 216 Ill. 2d at 306, citing Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority, 172 Ill. 2d 243, 256 (1996)), the plaintiff must present sufficient evidence to create a genuine issue of fact. Hussung, 369 Ill. App. 3d at 931, citing Gyllin, 260 Ill. App. 3d at 711. "Although summary judgment is appropriate if a plaintiff cannot establish an element of his claim (Morris v. Margulis, 197 Ill. 2d 28, 35 (2001), citing Pyne v. Witmer, 129 Ill. 2d 351, 358(1989)), it should only be granted when the right of the moving party is clear and free from doubt." Northern Illinois, 216 Ill. 2d at 306, citing Dowd & Dowd, Ltd. v. Gleason, 181 Ill. 2d 460, 483 (1998). Accordingly, we apply a *de novo* standard of review to the trial court's grant or denial of a summary judgment motion. Gaston, 365 Ill. App. 3d at 314, citing In re Estate of Hoover, 155 Ill. 2d 402, 411 (1993).

## Material Issues of Fact

Mr. Hernandez maintains that material issues of fact exist which preclude summary judgement because Dr. Kogan's decision not to bill Ms. Hernandez was not made in good faith. We note that the purpose of the Good Samaritan Act is to encourage persons to "volunteer" their time and talents. 745 ILCS 49/2 (West 2002). Section 25 of the Good Samaritan Act immunizes volunteer physicians from civil liability only if they: (1) "in good faith," (2) provide emergency care, (3) "without fee." 745 ILCS 49/25 (West 2002)[10]; Estate of Heanue, 355 Ill. App. 3d at 650-52. Therefore, we must determine whether there are any genuine issues of material fact in dispute in this case regarding Dr. Kogan's "good faith" in providing emergency care to Ms. Hernandez without fee because summary judgment is only proper when the right of the moving party is free of doubt. 735 ILCS 5/2-1005 (West 2006); Jones, 191 Ill. 2d at 291.

## Good Faith

There is no definition for good faith in the Good Samaritan Act. 745 ILCS 49/1 et seq. (West 2002). We note, however, that our supreme court has held that "good faith" is an unambiguous phrase that means "honest, lawful intent," or "is the opposite of fraud and bad faith." People v. Guagliata, 362 Ill. 427, 432 (1936), quoting Crouch v. First National Banks, 156 Ill. 342, 357 (1895) and McConnel v. Street, 17 Ill. 253, 254 (1855). In the Estate of Heanue, the court points out that

---

[10] "Physicians; exemption from civil liability for emergency care. Any person licensed under the Medical Practice Act of 1987 [(225 ILCS 60/1 et seq.)] or any person licensed to practice the treatment of human ailments in any other state or territory of the United States who, in good faith, provides emergency care without fee to a person, shall not, as a result of his or her acts or omissions, except willful or wanton misconduct on the part of the person, in providing the care, be liable for civil damages." (Emphasis added.) 745 ILCS 49/25 (West 2002).

the Good Samaritan Act provides that a physician "who, in good faith, provides emergency care without fee to a person" is immune. Estate of Heanue, 355 Ill. App. 3d at 650. The Estate of Heanue court also points out that the term "good faith" modifies the terms "provides emergency care" and "without fee" in the Good Samaritan Act. Estate of Heanue, 355 Ill. App. 3d at 650. Finally, the Estate of Heanue court stated, "[r]efraining from charging a fee simply to invoke the protection of section 25 [of the Good Samaritan Act] would seem to violate the requirement that the doctor's actions were in good faith, particularly if the decision not to charge a fee was made following treatment that could potentially expose a doctor to liability." Estate of Heanue, 355 Ill. App. 3d at 650.

## Emergency Care

Following the Estate of Heanue, we must first determine whether Dr. Kogan provided emergency medical services to Ms. Hernandez in good faith. Estate of Heanue, 355 Ill. App. 3d at 650. We note that there is no dispute between the parties that Dr. Kogan did in fact provide emergency care to Ms. Hernandez on June 6, 2002. We also note that there is no argument in the briefs that Dr. Kogan's emergency medical care was willful or wanton. Accordingly, we find that there are no facts in dispute concerning Dr. Kogan's good faith in providing emergency medical care to Ms. Hernandez.

## Medical Services Provided Without Fee

Next, we must determine whether there are facts in dispute concerning Dr. Kogan's decision not to bill Ms. Hernandez for his services: (1) was a good-faith decision made because the doctor had an honest, lawful intent to provide emergency medical services to Ms. Hernandez without fee?

- 15 -

or (2) was the doctor acting in bad faith when, after providing medical services to Ms. Hernandez, the decision was made not to bill for his medical services to invoke the protection of section 25 of the Good Samaritan Act? Estate of Heanue, 355 Ill. App. 3d at 650. Mr. Hernandez maintains that Dr. Kogan did not act in good faith when he failed to bill Ms. Hernandez for his medical services. Mr. Hernandez points out that the averments in Dr. Kogan's affidavit and his deposition testimony are inconsistent with the deposition testimony of Ms. Biga, the CFO of his billing service, regarding Dr. Kogan's routine billing practices. We note that in Dr. Kogan's affidavit, appended to the motion for summary judgment, the doctor avers that he did not bill Ms. Hernandez for his services. We note that Dr. Kogan's deposition testimony established: (1) that Dr. Kogan's routine practice was to submit billing information to his billing service after he had rendered care; (2) that Dr. Kogan routinely billed for interpreting echocardiograms, inserting central lines, and performing pericardiocentisis, the professional services he provided to Ms. Hernandez on June 6, 2002; and (3) that Dr. Kogan did not bill Ms. Hernandez for his medical services on June 6, 2002, because he thought it would have been "inappropriate." Finally, in his answers to the supplemental good-faith interrogatories, Dr. Kogan stated that during the past five years he did not issue a bill for his professional services (1) if he had no relationship with the patient, or (2) if he did not enter into a doctor-patient relationship.

The record reveals, however, that Ms. Biga, the CFO of Dr. Kogan's billing service since 1999, contradicted Dr. Kogan's testimony. Ms. Biga testified that she was unaware of any instance, other than Ms. Hernandez's case, when Dr. Kogan had not submitted patient information needed by the billing service to bill for professional services of the type provided to Ms. Hernandez on June

6, 2002. Mr. Hernandez argues that Dr. Kogan's deviation from his routine billing practice raised a material question of fact as to whether the doctor's decision not to bill was made in good faith. We agree.

We find that Dr. Kogan's answer to the supplemental good-faith interrogatory that he did not bill in cases like Ms. Hernandez's conflicts with Ms. Biga's testimony that, other than Ms. Hernandez's case, there were no other cases where Dr. Kogan had not billed patients for the medical services he provided to Ms. Hernandez. We also find that Dr. Kogan's decision not to bill Ms. Hernandez raises a question of material fact as to whether Dr. Kogan acted in good faith and had an honest, lawful intent to provide medical services without fee, or whether the doctor was acting in bad faith and deviated from his routine billing practices to invoke the protection of section 25 of the Good Samaritan Act. Guagliata, 362 Ill. at 432. Accordingly, given the conflicting testimony concerning Dr. Kogan's routine billing practices, and given the fact the conflicting testimony created a question of fact as to whether the doctor acted in good faith when he provided medical services to Ms. Hernandez without fee, this case presents questions of fact that must be resolved by a trier of fact. Petrovich, 188 Ill. 2d at 30-31.

CONCLUSION

In conclusion, a genuine issue of material fact exists in this case as to whether Dr. Kogan's decision to provide medical services to Ms. Hernandez without fee was made in good faith. In light of the fact we have found that there are genuine issues of material fact in dispute in this case, we need not reach the other issues raised in the briefs. Moreover, reviewing courts only reach constitutional issues as a last resort. In re E.H., 224 Ill. 2d 172, 178 (2006), citing People v. Lee, 214

1-06-1196

Ill. 2d 476, 482 (2005). Accordingly, this case is reversed and remanded for proceedings consistent with this opinion.

Reversed and remanded.

O'BRIEN, J., and MURPHY, J., concur.