2025 IL App (1st) 241085

FOURTH DIVISION
Order filed: February 20, 2025

No. 1-24-1085

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT
_____

| | | |
|---|---|---|
| WILMINGTON TRUST, NATIONAL ASSOCIATION, as Trustee for the Benefit of the Registered Holders of JPMBB Commercial Mortgage Securities Trust 2015-C32, Commercial Mortgage Pass-Through Certificates, Series 2015-C32, | ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 20 CH 7314 |
| THOR PALMER HOUSE RETAIL, LLC, UNKNOWN OWNERS, and NON-RECORD CLAIMANTS, | ) ) ) | |
| Defendants | ) ) | Honorable Marian E. Perkins, |
| (Thor Palmer House Retail, LLC, Defendant-Appellant). | ) ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Rochford and Justice Lyle concurred in the judgment and opinion.

**OPINION**

¶ 1     This appeal concerns a commercial mortgage foreclosure action initiated by Wilmington Trust, National Association, as Trustee for the Benefit of the Registered Holders of JPMBB Commercial Mortgage Securities Trust 2015-C32, Commercial Mortgage Pass-Through Certificates, Series 2015-C32 ("the Lender"), against Thor Palmer House Retail, LLC ("the

Borrower"). The Borrower appeals from a final judgment entered in favor of the Lender, arguing that the court erred (1) by denying its motion for partial summary judgment on what it contends was a request from the Lender for a deficiency judgment, (2) by including a certain paragraph in the final judgment that the Borrower maintains amounted to an advisory opinion, and (3) by granting the portion of the Lender's motion for summary judgment that awarded the Lender a "Prepayment Premium" of about $8.2 million. We agree with the Borrower in full on the first two issues and as to the amount awarded in the third issue.

¶ 2     The basic facts that precipitated the underlying foreclosure action are not in dispute. In 2015, the Lender's predecessor in interest, Barclays Bank PLC ("Barclays"), issued a $62 million loan to the Borrowers, which was secured by a mortgage on a collection of retail shops located at 119 South State Street, Chicago, IL 60603 ("the Property"). In 2016, Barclays assigned its interest in the loan and mortgage to the Lender. In 2020, following the onset of the COVID-19 pandemic, the Borrower stopped making payments under the loan, with its last payment having an effective date of April 6, 2020. On July 21, 2020, the Lender sent the Borrower a notice of default, and on November 9, 2020, the Lender sent the Borrower a notice of acceleration and demand for payment of rents.

¶ 3     In December 2020, the Lender filed a complaint against the Borrower, asserting two claims for relief, one for foreclosure on the mortgage and one for foreclosure on its interest in the personal property and fixtures located at the Property. Within its claim for foreclosure on the mortgage, in a section naming "defendants claimed to be personally liable for deficiency," the Lender listed "[the Borrower], to the extent permitted under the Loan Documents." At the conclusion of that foreclosure claim, the Lender listed seven requests for relief, which included a request for "[a]

judgment for deficiency in the amount owed, to the extent the sale of the Mortgaged Premises results in such deficiency, but only to the extent permitted under the Loan Documents." The complaint did not provide any further allegations regarding the basis for a deficiency judgment. The Borrower answered the complaint and admitted that it failed to make certain monthly payments, but it denied that the Lender was entitled to a deficiency judgment.

¶ 4 In February 2022, the Lender filed a motion for summary judgment on both counts in its complaint, along with a memorandum of law and a proposed order. In the motion and the memorandum, the Lender included the same request for a deficiency judgment that it had set forth in its complaint, and in its proposed order granting the motion the Lender included the statement, "If the money arising from said sale shall be insufficient to pay in full the Judgment Amount, the Sale Officer shall specify the amount of such deficiency in the report of sale, and a personal deficiency judgment shall be entered therefor, if appropriate." However, two paragraphs down, the proposed order stated that "[n]othing in this Judgment shall be construed to grant Plaintiff a monetary deficiency judgment against Defendants." That paragraph also contained a statement that the judgment shall not be deemed to have any preclusive effect on the Lender's right to pursue a future deficiency judgment against the Borrowers or any guarantors.

¶ 5 The Lender stated in the motion and memorandum that the Borrower's indebtedness as of November 6, 2021, was more than $77 million, which included a "Prepayment Premium" of more than $8.2 million. The basis for the Prepayment Premium was section 2.3.4 of the loan agreement, which addressed the payment of interest following a default. In relevant part, it provided as follows:

> "In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Note shall accrue interest at the Default Rate, calculated from the date the Default occurred which led to such an Event of Default without regard to any grace or cure periods contained herein. If, during the continuance of an Event of Default, payment of all or any part of the principal of the Loan is tendered by Borrower, a purchaser at foreclosure or any other Person, whether upon acceleration of the Loan or otherwise, such tender shall be deemed an attempt to circumvent the prohibition against prepayment set forth in Section 2.4.1 and Borrower, such purchaser at foreclosure or other Person shall pay, in addition to the outstanding principal balance, all other amounts due hereunder and all accrued and unpaid interest \*\*\*, *plus if such prepayment is made prior to the Release Date, a prepayment fee equal to one percent (1%) of the amount of principal being repaid, together with the Yield Maintenance Premium calculated with respect to the amount of principal being repaid.*" (Emphasis added.)

Throughout this litigation, the parties have together referred to the 1% prepayment fee and the Yield Maintenance Premium (YMP) discussed at the end of this provision as the "Prepayment Premium." The "Yield Maintenance Premium" referenced in that section is defined as "an amount equal to the greater of: (i) one percent (1%) of the principal amount of the Loan being prepaid or (ii) the present value as of the Prepayment Date of the Calculated Payments from the Prepayment Date through the Permitted Prepayment Date determined by discounting such payments at the Discount Rate. As used in this definition, the term 'Prepayment Date' shall mean the date on which prepayment is made."

¶ 6    In support of its allegations regarding the Borrower's indebtedness, the Lender attached an affidavit from Dmitry Sulsky, an asset manager for LNR Partners, LLC, which acted as the servicer for the loan at issue. In the affidavit, Sulsky provided his conclusions as to the various amounts owed by the Borrower, which included the $8.2 million Prepayment Premium, and he averred that he determined the amounts owed by reviewing a "Transaction History" and "Payoff Statement." His affidavit did not explain the specific calculations leading to his conclusions as to the amounts owed. The Transaction History attached to Sulsky's affidavit showed that the Borrower's last payment under the loan had an effective date of April 6, 2020. The Payoff Statement, which listed the various amounts required to pay off the remainder of the loan as of November 6, 2021, showed that the Borrower owed more than $8.2 million for a Prepayment Premium, but it did not provide any further information regarding the basis for that figure.

¶ 7    In its response to the Lender's motion, the Borrower did not oppose the entry of a partial summary judgment on the issue of foreclosure, but it objected to the Lender's request for a deficiency judgment and to the Lender's calculation of the amount due for the Prepayment Premium. Regarding the deficiency judgment, the Borrower argued that section 11.22 of the loan agreement prohibited the Lender from seeking a money judgment or deficiency judgment against the Borrower unless one of thirteen particular events occurred and that the Lender had not cited any exception to that prohibition and had not alleged any undisputed facts supporting the existence of an exception. As for the Prepayment Premium, the Borrower argued that it was not liable for a Prepayment Premium under the loan agreement because no prepayment occurred prior to the Release Date defined in the agreement and because it is the responsibility of the party who purchases the property at the foreclosure sale to pay the Prepayment Premium; that the Lender's

calculation of the amount due for the Prepayment Premium impermissibly doubled counted interest; and that no prepayment that would implicate the Prepayment Premium had yet been made, rendering the calculation of the amount owed inaccurate.

¶ 8     The Borrower supported its arguments with an affidavit from Page Harrison, Executive Director of Asset Management at Thor Equities. In her affidavit, Harrison stated that she attempted to verify Dmitry Sulsky's conclusions of the amounts due by reviewing Sulsky's affidavit, the documents that he used to reach his conclusions, and a document provided by the Lender titled "Prepayment Charge – Preliminary Estimate," which stated, "THE PREPAYMENT CHARGE SHOWN WAS CALCULATED AS OF THE PREPARATION DATE SHOWN AND IS, THEREFORE, A PRELIMINARY ESTIMATE ONLY. THE FINAL PREPAYMENT CHARGE WILL BE CALCULATED AS OF THE DATE SPECIFIED IN THE LOAN DOCUMENTS." Based on those documents, Harrison concluded that the Lender's $8.2 million figure for the Prepayment Premium was based on an assumed $59 million prepayment occurring on November 6, 2021. However, Harrison averred that no such prepayment had occurred on that date and that the $8.2 million figure was, therefore, erroneous.

¶ 9     In its reply to the Borrower's response, the Lender argued that Sulsky's affidavit met all of the legal requirements for proving the amount of the Borrower's indebtedness and that Sulsky was not required to provide a detailed explanation of the math underlying his conclusions. The Lender also argued that the Release Date restriction cited by the Borrower only applies to the 1% prepayment fee component of the Prepayment Premium and not the YMP, and it contended that the language of the loan agreement allowed for the Borrower to be held responsible for paying the Prepayment Premium. Regarding the deficiency judgment, the Lender asserted that it was "not

presently seeking a recourse judgment against Borrower," which it contended was evidenced by the language in its draft order stating that "[n]othing in this Judgment shall be construed to grant Plaintiff a monetary deficiency judgment against Defendants" and that the judgment shall not preclude the Lender from seeking a deficiency judgment against the Borrower in the future.

¶ 10      At the hearing on the Lender's motion for summary judgment, counsel for the Lender explained its position regarding the deficiency judgment:

> "We don't know until the sale occurs what the deficiency, if any, will be and, therefore, the extent to which a personal deficiency even could be pursued against the Borrower. So our expectation is that that issue of the amount of any deficiency and whether we are -- Lender is entitled to a personal deficiency judgment against Borrower, will be litigated in connection with Lender's efforts to confirm -- to ask the Court to confirm the sale; and at that point should there be a deficiency and should it be appropriate under the loan documents, enter a personal deficiency judgment against the Borrower in connection with the hearing confirmation process. In other words, not a today issue, a down-the-road issue following the foreclosure sale itself. *** And, obviously, our motion does not set forth the basis upon which we could seek potentially a personal deficiency judgment against the Borrower because our intention is not to do so at this time but to determine the amount of the deficiency and then litigate that issue if necessary, again, during the confirmation process."

The Lender's counsel also addressed the Prepayment Premium and the Borrower's assertion that the $8.2 million figure alleged by the Lender inaccurately relied on a nonexistent prepayment in November 2021. The Lender did not dispute the Borrower's interpretation of the issue. Rather, it

seemed to concede the issue, with counsel for the Lender explaining that the Lender was required to select a payoff date in order to generate a payoff statement, so it selected the November 6, 2021, date and calculated the amounts due as of that date:

> "Obviously, as part of the foreclosure judgment process, the Lender has to generate a payoff statement with a payoff date and calculate the amounts due based on that date. That's what the Lender did here. It generated a payoff statement. It had to select a payoff date. It did and it calculated the yield maintenance premium as of that date. So to the extent that there is a different prepayment date, for example, on the foreclosure sale date, recalculation of the yield maintenance premium is certainly something that lender can do; but as of the date in the payoff statement supporting motion, the yield maintenance premium was properly calculated."

¶ 11    Following the hearing, the circuit court took the matter under advisement. Subsequently, the Borrower filed a motion for ruling on the Lender's motion for summary judgment. At a May 2, 2023, hearing on that motion, the court issued an oral ruling granting the Lender's motion for summary judgment as to the foreclosure issue. The court did not explain its ruling and added only that "the arguments set forth by the [Lender] in its motion will be the numbers that are used for the judgment of foreclosure." Regarding the deficiency judgment, the court continued the matter to a later date for further argument.

¶ 12    At that subsequent hearing in June 2022, the Lender stated that it was not seeking a deficiency judgment at that time but might do so after the foreclosure sale. In its view, the deficiency issue was "premature" at that time and would not be "ripe" until after the foreclosure sale. The Borrower responded that there was no need to wait for a foreclosure sale because the

loan was non-recourse in nature and the Lender was "simply not entitled to a deficiency at all." The circuit court agreed with the Lender that the matter was not yet ripe and stated that the parties could revisit the issue following the foreclosure sale. The parties also addressed the Prepayment Premium, with the Borrower arguing again that the Lender's $8.2 million figure impermissibly double-counted interest and that the amount should not be determined until the foreclosure sale takes place, and the Lender arguing that section 2.3.4 of the loan agreement allowed for it to collect both the YMP and unpaid interest. On that issue, the court again ruled in favor of the Lender without further explanation.

¶ 13    Following the hearing, the court entered two written orders on June 22, 2023, one continuing the deficiency judgment issue "until a future date following the foreclosure sale," and a second granting the Lender's motion for summary judgment. In the order granting summary judgment, the court awarded the Lender a judgment for the entire amount that the Lender alleged was due as of November 6, 2021, totaling $77,428,345.82, which included the $8.2 million Prepayment Premium, plus *per diem* interest of $16,583.39 for each day from November 6, 2021, to the date of that order, as well as additional costs and fees.

¶ 14    The Property was auctioned on September 6, 2023, and the Lender was the winning bidder with a credit bid of $29,520,000. The Lender then moved for confirmation of the sale and submitted a proposed order that included statements that "[n]othing in this Order shall be construed as a request to grant [Lender] a monetary deficiency judgment against [Borrower]" and that "[a]ll parties' rights, remedies, and defenses are fully reserved with respect to any potential deficiency judgment." The Borrower objected to the inclusion of those statements, arguing in its response to the Lender's motion that the Lender had indeed sought a deficiency judgment and that the Lender

should not be granted the right to pursue a deficiency judgment in the future because such an action would be barred by *res judicata*.

¶ 15    At the same time, the Borrower separately filed a motion for partial summary judgment on the deficiency judgment issue. The Borrower supported its motion with an affidavit from Daniel Amodio, Vice President of Asset Management at Thor Equities, in which Amodio addressed each exception to the non-recourse provision of the loan agreement and averred that none of the events that would allow for the Lender to obtain a deficiency judgment against the Borrower had occurred in this case. In its response to the Borrower's motion, the Lender argued that summary judgment on the deficiency judgment issue would be inappropriate because it was not seeking such a judgment. Following a hearing at which the parties put forth their arguments, the court issued an oral ruling in favor of the Lender on both pending motions. The court reasoned that the Illinois Mortgage Foreclosure Law allows a lender to request a deficiency judgment in its complaint and then decide later whether it wants to pursue it, which the Lender in this case decided not to do, rendering the deficiency issue, in the court's words, "not relevant." Further, the court opined that the Lender was not required to amend its complaint to remove the request for a deficiency judgment, it could simply choose not to pursue it.

¶ 16    Following the hearing, on April 25, 2024, the court entered a written order confirming the foreclosure sale. The court found that, after deducting the Lender's credit bid, there remained $59,304,055.34 unpaid from the judgment against the Borrower. The order also contained the following paragraph ("Paragraph 8") addressing the deficiency issue:

> "8. Plaintiff is not seeking any personal deficiency judgment against Borrower, this
> Order does not enter a personal deficiency judgment against Borrower, and this Order does

not resolve any issues relating to a personal deficiency judgment claim. This Order also does not address: (i) [Lender's] ability to seek a deficiency judgment against any guarantor at a later time (which is not before the Court); and/or (ii) any guarantor's rights and defenses that may be asserted to contest any such deficiency judgment action (which are not before the Court)."

An amended order correcting only the legal description of the Property was entered on June 10, 2024. This appeal follows.

¶ 17    The Borrower raises three issues on appeal. First, the Borrower asserts that the circuit court erred in denying its motion for partial summary judgment on the issue of whether the Lender was entitled to a deficiency judgment against it. Second, the Borrower argues that the second sentence of Paragraph 8 of the order confirming the foreclosure sale amounted to an advisory opinion that must be stricken. Third, the Borrower contends that the court erred in including the Lender's requested $8.2 million Prepayment Premium in the judgment entered against it. We see merit to each of the Borrower's arguments and will address them in turn.

¶ 18    The Borrower's first issue concerns the circuit court's denial of its motion for partial summary judgment, in which it sought a ruling that the Lender was not entitled to a deficiency judgment against it. Before we discuss the merits of that argument, we must address our jurisdiction to review the court's ruling. The Lender contends that we lack jurisdiction to review this issue, citing the general rule that, "[o]rdinarily, the denial of summary judgment is not appealable, because such an order is interlocutory in nature." *Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 119. The Borrower asserts that several exceptions to this rule apply here, and we agree that at least one such exception permits review in this case.

¶ 19    Specifically, our court has held that "the propriety of the denial may be considered if the case is properly before a reviewing court from a final judgment and no trial or hearing has been conducted." *Id.* (citing *DePluzer v. Village of Winnetka,* 265 Ill. App. 3d 1061, 1064 (1994), and *La Salle National Bank v. Malik,* 302 Ill. App. 3d 236, 247 (1999)). The Lender contends that this "no trial or hearing" exception does not apply in this case because the circuit court *did* conduct a hearing at the sale-confirmation stage. However, the type of hearing contemplated in this exception is one of an evidentiary nature. See *Regnery v. Regnery*, 211 Ill. App. 3d 607, 613 (1991) (allowing review of the denial of a motion for summary judgment when there has been "no trial or evidentiary hearing"); *Cedric Spring & Associates, Inc. v. N.E.I. Corp.*, 81 Ill. App. 3d 1031, 1034 (1980) ("We can discern no reason in the rationale of [two prior decisions] that would or should preclude us from reviewing the denial of a motion for summary judgment where the case is on appeal before us from a final judgment and there has been no evidentiary hearing or trial, and the party seeking such review has not in any way prevented or avoided such hearing or trial."). The confirmation-of-sale hearing that the Lender references in this case solely involved the parties presenting their arguments to the court, and the court did not receive any evidence. Accordingly, the "no trial or hearing" exception is applicable to the present case and allows us to review the denial of the Borrower's motion for partial summary judgment.

¶ 20    Turning to the merits of the issue, the Borrower asserts that the circuit court erred in denying its motion for partial summary judgment because the record demonstrates that the Lender did in fact plead a claim for a deficiency judgment, the Lender never amended its complaint to remove that request, and the summary judgment evidence demonstrated that the Lender was not entitled to a deficiency judgment. The Lender argues in response that it had the power to choose

to seek or not seek a deficiency judgment, that it did not ask the court to enter a deficiency judgment at the sale-confirmation stage, and that, as a result, the deficiency judgment issue was not before the court to be ruled upon when the Borrower moved for partial summary judgment. We are persuaded by the Borrower's view of the issue.

¶ 21    "Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Hernandez v. Alexian Brothers Health System*, 384 Ill. App. 3d 510, 518 (2008). "In order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle him, her or it to a judgment." *Id.* (citing *Hussung v. Patel,* 369 Ill. App. 3d 924, 931 (2007)). The circuit court's grant or denial of a motion for summary judgment is reviewed *de novo*. *Id.* at 519.

¶ 22    The primary point of contention on this issue is whether there was a claim for the court to rule upon at the time of the Borrower's motion for partial summary judgment. The Borrower argues that the Lender effectively pled a claim for a deficiency judgment when it asked for a deficiency judgment in its prayer for relief in its complaint, never amended the pleading to remove that request, asked for such a judgment in its draft order granting its February 2022 motion for summary judgment, and stated at the hearing on its motion for summary judgment that it might seek a deficiency judgment following the foreclosure sale. Caselaw cited by the Borrower supports its contention that the Lender did indeed plead a separate claim for a deficiency judgment.

¶ 23    In *MB Financial Bank, N.A. v. Allen*, 2015 IL App (1st) 143060, ¶ 28, this court held that a specific request for a "a personal judgment for deficiency, if applicable, and sought only against

parties who have not received a Chapter 7 bankruptcy charge or who were not protected by the automatic stay at sale confirmation," within the plaintiff's prayers for relief was sufficient to raise a claim for a deficiency judgment. We reached the same conclusion in *U.S. Bank Trust, N.A. v. Atchley*, 2015 IL App (3d) 150144, ¶¶ 3, 12, holding there that the plaintiff's specific request for "[a] personal judgment for deficiency, if applicable and sought, and only against parties who have signed the Note," allowed for the entry of a deficiency judgment against the defendant. Our supreme court has also addressed this issue within the context of the single-refiling rule and held that, although the plaintiff's complaint presented only one formal count for relief, which was a claim for foreclosure, the plaintiff's specific request in its prayer for relief for "a personal judgment for deficiency, if sought," effectively asserted a second claim for a deficiency judgment. *First Midwest Bank v. Cobo*, 2018 IL 123038, ¶ 20.

¶ 24 Based on this precedent, we conclude that the Lender in this case raised a claim for a deficiency judgment. In its complaint, the Lender listed the Borrower as the "defendant[] claimed to be personally liable for deficiency," and at the conclusion of its foreclosure claim the Lender listed seven requests for relief, which included a request for "[a] judgment for deficiency in the amount owed, to the extent the sale of the Mortgaged Premises results in such deficiency, but only to the extent permitted under the Loan Documents." Furthermore, counsel for the Lender explained at the hearing on its motion for summary judgment that it might seek a deficiency judgment at the sale-confirmation stage. The cases discussed above establish that these actions by the Lender were sufficient to raise a specific claim for a deficiency judgment.

¶ 25 Because the Lender raised a claim for a deficiency judgment, the Borrower was entitled to move for partial summary judgment on that claim. See 735 ILCS 5/2-1005(b) ("A defendant may,

at any time, move with or without supporting affidavits for a summary judgment in his or her favor as to all or any part of the relief sought against him or her."). When the Borrower did so in this case, it provided an affidavit from Daniel Amodio in which Amodio averred that none of the events described in the loan agreement that would allow for the Lender to obtain a deficiency judgment against the Borrower had occurred in this case. In its response to the Borrower's motion, the Lender did not dispute Amodio's averments or otherwise put forth any allegations or arguments supporting its entitlement to a deficiency judgment against the Borrower. Instead, it simply stated that it was not seeking a deficiency judgment at that time. The Lender's failure to refute the Borrower's allegations and failure to "present a factual basis that would arguably entitle *** it" to a deficiency judgment (*Hernandez*, 384 Ill. App. 3d at 518), is fatal to its claim. See *Sacramento Crushing Corp. v. Correct/All Sewer, Inc.*, 318 Ill. App. 3d 571, 575 (2000) ("In the face of supporting affidavits from the moving party, the nonmovant must submit counteraffidavits (or refer to depositions or admissions on file) in order to raise an issue of fact sufficient to survive summary judgment. [Citation.] Failure to file counteraffidavits in opposition to a summary judgment motion supported by affidavits is fatal.").

¶ 26    Because the Lender raised a claim for a deficiency judgment, the Borrower supported its motion for summary judgment with an affidavit establishing that the Lender was not entitled to a deficiency judgment, and the Lender did not counter the Borrower's affidavit with evidence of its own establishing a genuine issue of material fact regarding its claim for a deficiency judgment, the circuit court erred in denying the Borrower's motion for partial summary judgment on that issue. This conclusion also requires that the first sentence of Paragraph 8 of the court's order confirming the foreclosure sale be stricken.

¶ 27    For its second issue, the Borrower asserts that the second sentence of Paragraph 8 amounts to an improper advisory opinion that should also be stricken. See *In re Luis R.*, 239 Ill. 2d 295, 306 (2010) ("It is well settled that Illinois courts cannot pass judgment on mere abstract propositions of law, render an advisory opinion, or give legal advice as to future events." (Internal quotation marks and citation omitted)). That sentence stated: "This Order also does not address: (i) [The Lender's] ability to seek a deficiency judgment against any guarantor at a later time (which is not before the Court); and/or (ii) any guarantor's rights and defenses that may be asserted to contest any such deficiency judgment action (which are not before the Court)." We agree with the Borrower that it was improper for the circuit to opine regarding the potential preclusive effects of the judgment it was rendering. Whether the present judgment has any effect on the Lender's ability to seek a judgment against a guarantor was not at issue and should not have been addressed. That subject is for a potential future court to examine if and when such an action arises. The court's second sentence in Paragraph 8 was an improper advisory opinion that must also be stricken.

¶ 28    In its third issue, the Borrower contends that the circuit court erred in granting the portion of the Lender's motion for summary judgment awarding the Lender a Prepayment Premium of $8,231,897.52. The Borrower challenges the Prepayment Premium award on four different grounds, arguing (1) that it is not responsible for paying the Prepayment Premium at all because it did not make a prepayment, (2) that no Prepayment Premium is owed because no prepayment was made before the Release Date identified in the loan agreement, (3) that the evidence did not support the $8.2 million figure put forth by the Lender, and (4) that the $8.2 million Prepayment Premium effectively awarded the Lender an impermissible double recovery.

¶ 29     The Borrower's first two arguments each concern the interpretation of section 2.3.4 of the loan agreement and the meaning of the language used therein. However, in advancing its preferred reading of the agreement, the Borrower does not support its argument with citations to any authorities, as is required by Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). See *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) ("Both argument and citation to relevant authority are required."). Notably, the Borrower does not make any argument or cite any authority regarding which of the many contract-interpretation principles should guide our review of this issue, other than very generally stating at the outset of the argument section of its brief that issues of contract interpretation are reviewed *de novo*, which of course is not always the case. See, *e.g.*, *Gomez v. Bovis Lend Lease, Inc.*, 2013 IL App (1st) 130568, ¶ 24 (explaining that issues regarding unambiguous contract provisions can be decided as a matter of law, while ambiguous provisions can be decided as a matter of either law or fact depending on whether the facts evidencing the parties' intent are in dispute). The Borrower also does not cite any authority addressing similar contract language or otherwise inform us that it researched the issue but could find no applicable decisions. Ultimately, the Borrower merely recites the language at issue and states that its reading of the agreement is the correct one. This cursory argument is insufficient and amounts to a forfeiture of the position. See *Vancura*, 238 Ill. 2d at 369-70; *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (1st Dist. 2009) ("A reviewing court is entitled to have the issues clearly defined and supported by pertinent authority and cohesive arguments; it is not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate or seek error in the record." (quoting *Obert v. Saville,* 253 Ill. App. 3d 677, 682 (1993)); *Dillon v. Evanston Hosp.*, 199 Ill. 2d 483, 493 (2002) (noting that even a three-page-long argument containing no citations to authority was insufficient under Rule 341).

¶ 30    Moving to the Borrower's third argument, it contends that the approximately $8.2 million figure awarded to the Lender for the Prepayment Premium was not supported by the record and that summary judgment was, therefore, inappropriate. The Borrower is correct.

¶ 31    In its motion for summary judgment, the Lender asserted that the Borrower owed a Prepayment Premium of $8,231,897.52. It supported this allegation with the affidavit of Dmitry Sulsky, who averred that he had reached that conclusion by reviewing a Transaction History and Payoff Statement. In its response to the Lender's motion, the Borrower opposed the $8.2 million Prepayment Premium on several grounds, including that the amount was incorrect. It supported this assertion with a counter-affidavit from Page Harrison in which Harrison explained in detail that the Lender's $8.2 million figure was based on an assumed, but nonexistent, prepayment of $59,090,431.20 on November 6, 2021, and was, therefore, erroneous. In its reply, the Lender did not contest Harrison's conclusions and instead argued that Sulsky's affidavit was legally sufficient and that Sulsky was not required to provide a detailed explanation of the math underlying his conclusions. At the hearing on the Lender's motion, counsel for Lender again did not dispute the Borrower's interpretation of the matter and instead seemed to concede the point, explaining that the Lender "ha[d] to generate a payoff statement with a payoff date and calculate the amounts due based on that date. That's what the lender did here. It generated a payoff statement. It had to select a payoff date. It did and it calculated the yield maintenance premium as of that date." Counsel for the Lender further agreed that the Prepayment Premium could be recalculated based on the actual prepayment date, stating, "to the extent that there is a different prepayment date, for example, on the foreclosure sale date, recalculation of the yield maintenance premium is certainly something that lender can do ***."

¶ 32　This record demonstrates that the Lender failed to establish its entitlement to summary judgment on its claim that the Borrower owed a Prepayment Premium in the amount of $8,231,897.52. To the contrary, the summary judgment evidence demonstrates that the Lender's chosen date of November 6, 2021, was objectively incorrect because no prepayment had occurred on that date. Instead, the only prepayment appearing in the record is the foreclosure sale, which occurred on September 6, 2023. See *Abdul-Karim v. First Federal Savings & Loan Ass'n of Champaign*, 101 Ill. 2d 400, 410 (1984) (recognizing that the proceeds of a foreclosure sale are a prepayment of the borrower's indebtedness).

¶ 33　Although the Borrower asks that we vacate the award of the Prepayment Premium entirely, vacation of that portion of the judgment is not warranted because the Borrower has not put forth any non-forfeited argument that it is not responsible for paying the Prepayment Premium at all. Instead, we affirm the Lender's entitlement to the Prepayment Premium, vacate the $8.2 million award, and remand with instructions for the circuit court to correct the amount of the Prepayment Premium to reflect a prepayment date of September 6, 2023. See Ill. S. Ct. R. 366(a)(5) (eff. Feb. 1, 1994) (permitting a reviewing court to "enter any judgment and make any order that ought to have been given or made").

¶ 34　Lastly, the Borrower argues that, because the Prepayment Premium is intended to compensate the Lender for interest that is lost as a result of prepayment, awarding the Prepayment Premium for the period of November 6, 2021, to September 6, 2023, effectively gave the Lender a double recovery of interest because the Lender was also receiving *per diem* interest under the loan agreement for the same time period. However, the above correction of the prepayment date

renders this issue moot because the accrual of *per diem* interest terminated on the date of the foreclosure sale.

¶ 35    For the foregoing reasons, we reverse the denial of the Borrower's motion for partial summary judgment, vacate Paragraph 8 of the order confirming the foreclosure sale, affirm the finding that the Lender is entitled to a Prepayment Premium from the Borrower, and vacate the portion of the judgment awarding the Lender a Prepayment Premium of $8,231,897.52. We remand the matter with directions for the circuit court to enter partial summary judgment in favor of the Borrower on the Lender's claim for a deficiency judgment and to recalculate the amount of the Prepayment Premium owed to the Lender based on a $29,520,000 prepayment occurring on September 6, 2023.

¶ 36    Affirmed in part, reversed in part, vacated in part, and remanded with instructions.

No. 1-24-1085

---

***Wilmington Trust v. Thor Palmer House Retail,* 2025 IL App (1st) 241085**

---

Appeal from the Circuit Court of Cook County, No. 20 CH 7314,
Judge Marian E. Perkins, Judge, presiding

---

Appellant:   John D. Burke, Thomas W. Dimond, Michael W. Ott, Jin Lee
ICE MILLER LLP
200 West Madison, Suite 3500
Chicago, Illinois 60606-3417
Phone: (312) 726-1567

Appellee:   Paul E. Chronis Elinor H. Murarova
Duane Morris LLP
190 South LaSalle Street, Suite 3700
Chicago, Illinois 60603
Phone:  (312) 499-6700